**EXHIBIT 1**

*Coster Realty v. Schwat Realty et al.*, No. 481393, Montgomery
County Circuit Court

**Summary Judgment Hearing Transcript**

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND


------------------------------X
                              :
COSTER REALTY, LLC,           :
                              :
          Plaintiff,          :
                              :
               v.             :          Civil No. 481393
                              :
SCHWAT REALTY, LLC, ET AL.,   :
                              :
          Defendants.         :
                              :
------------------------------X


MOTIONS HEARING




Rockville, Maryland                      September 22, 2021




DEPOSITION SERVICES, INC.
P.O. BOX 1040
Burtonsville, Maryland 20866
(301) 881-3344

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
COSTER REALTY, LLC,           :
                              :
        Plaintiff,            :
                              :
            v.                :     Civil No. 481393
                              :
SCHWAT REALTY, LLC, ET AL.,   :
                              :
        Defendant.            :
                              :
------------------------------X
```

Rockville, Maryland

September 22, 2021

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE:    THE HONORABLE JOSEPH M. QUIRK, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

BRANDEN LEWISTON, Esq.
RACHEL E. MUELLER, Esq.
Aegis Law Group, LLP
801 Pennsylvania Avenue, N.W., Suite 740
Washington, D.C. 20004

FOR THE DEFENDANTS:

DEBORAH B. BAUM, Esq.
WILLIAM C. MILLER, Esq.
Pillsbury, Winthrop, Shaw, Pittman, LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036-3006

I N D E X

Page

Judge's Ruling                                        31

1                      P R O C E E D I N G S

2              THE CLERK:  Calling civil 481393, Coster Realty, LLC

3    v. Schwat Realty, LLC, et at.

4              THE COURT:  All right, would counsel identify please.

5              MR. LEWISTON:  Brandon Lewiston for Coster Realty,

6    LLC.

7              MS. MUELLER:  And Rachel Mueller also here for the

8    plaintiff Coster Realty, LLC.

9              THE COURT:  There you are, okay.

10             MS. BAUM:  Your Honor, good morning.  Debra Baum on

11   behalf of all defendants.

12             MR. MILLER:  William Miller on behalf of all the

13   defendants as well Your Honor.

14             THE COURT:  Okay.  We're here, let's see.  We're here

15   on defendant's motion for partial summary judgement at docket

16   entry 107.  All right, I'll hear from you.

17             MS. BAUM:  Thank you Your Honor.

18             THE COURT:  Everybody else can be seated.

19             MS. BAUM:  We're here for partial summary

20   judgement --

21             THE COURT:  Right.

22             MS. BAUM:  -- Your Honor in this case.  The plaintiff

23   frankly has done a good job of trying to make this look very,

24   very complicated.  And what I'm going to try to do this morning

25   is break it down and I think the move for partial summary

1   judgement because there are a couple of remaining claims where

2   we think the overwhelming evidence shows that they're

3   completely baseless.  But we didn't think that we could

4   credibly say that because of some of the allegations and the

5   record we didn't think we could credibly say that it was ripe

6   for summary judgement.

7           I'd like to talk a little bit about theme running

8   through all of this which is sort of what's really going on

9   here, what's being said versus what's really going on here.  As

10  we pointed out in our papers as Your Honor no doubt knows this

11  is one of five cases being pursued in four different Courts by

12  Ms. Coster through the same counsel.  And while they describe

13  this case in the first page of their opposition to our motion

14  that this is a situation where our clients have repeatedly

15  obscured from her business and financial affairs and cheated

16  Ms. Coster out of payouts due her.

17          What the evidence shows and what the evidence that's

18  in the record is emails transmitting detailed spreadsheets

19  showing exactly what's being paid to her year after year.  What

20  you won't see in the record is anything coming back from her

21  saying, from her or her accountant saying I don't understand

22  this.  What's going on here, I'd like to have more vision into

23  this.  Instead what the record shows, what's really going on

24  here is I know Ms. Coster inherited this piece of company, a

25  series of companies and special purpose entities after her

1   husband unfortunately passed away in April of 2015.

2          From 2017, 2018 she decides she wants to try to get

3   bought out of all of her interests in everything.  When that

4   didn't work, and this isn't just argument by us.  We have a lot

5   of discovery from the Delaware cases, from the District of

6   Columbia cases, we have emails from her advisor saying time to

7   rachet up the pressure.  If I were advising her I wouldn't want

8   to represent the poor, opposing the poor grieving widow in

9   front of a jury.  And then from her close advisor, frankly

10  Marion doesn't care about the long-term best interest of the

11  company, she only wants to cash out.

12          So since that time we have the five lawsuits.  The

13  hallmark of what's really going on here in this particular case

14  is that for none of these claims is there any calculation of

15  damages.  Is there any expert?  They've hired no expert.  It's

16  throw it all in there, make it sound really complicated and

17  let's get as they said in their emails, the poor grieving widow

18  in front of a jury.

19          So we have all these claims and they've sort of at

20  least $3 million in damages with no calculation was submitted,

21  interrogatories, we asked who are your experts how were your

22  damages calculated.  No calculation of damages, no experts on

23  any of them.  So now I'm going to take one-by-one our specific

24  claims on which we seek summary judgement.

25          The first one are the, I think it's probably candidly

1  the easiest, the claims that are more than three years old.

2  They included claims or there are a series of claims on

3  specific distributions that were made to Ms. Coster from which

4  the entities deducted specific sums.  For example, money that

5  they had paid on her behalf to the estate's lawyer for legal

6  services related to the estate.  These things were documented,

7  back up sent to her, invoices from the lawyers, invoices from

8  accountants sent to her in 2015 and 2016.

9       The plaintiff cites the continuing harm doctrine as a

10  purported justification for bringing clearly time barred claims

11  at this point.  They selectively from the Lids case to suggest

12  that that case held that where there's a continuing harm you

13  can then bring claims that are more than three years old.  I

14  respectfully submit that they omitted the key language from the

15  case that says that the gest of the continuing harm doctrine is

16  if it's a continuing harm, is sort of a same kind of thing

17  that's happening you're not necessarily time barred from the

18  current claims, the ripe claims within the last three years.

19  But your don't revive the stale claims, the case is very clear

20  on that.

21       So with respect to the claims regarding deductions

22  prior to April 17, 2017 which would be all the 2015, all the

23  2016 deductions that they cite in their complaint we move for

24  summary judgement on those.  I don't see how there could be any

25  issue there.  On the second category of claims, the claims have

1   also claims that one of the ways in which she has been harmed

2   is through what she describes as a series of intercompany

3   loans.

4          Now this is a real estate development firm owned

5   originally by three men who owned it together and as the record

6   shows, they're not careful during the time Mr. Coster was alive

7   about crossing I's and dotting T's relative to corporate

8   niceties.  But they have ledgers that show exactly what was

9   done over all those years and there are loans that went back

10  and forth between a lot of these commonly owned companies.  And

11  so that practice has continued.  They're all there, a whole

12  bunch of different entities and when one needs cash they'll

13  borrow it from the other, the CFO makes an entry on the ledger,

14  shows it as a loan from or to and then they pay it back.

15         Almost all of these, the ones that they cite, all of

16  the ones they cite in their complaint are loans made from

17  Maryland Residential to entities that Ms. Coster also owns, the

18  UIP companies.  So how there's any harm there is hard to see.

19  And of course they haven't identified any or calculated any

20  damages.  There are to be transparent a handful of loans that

21  were made from one entity to an entity where she didn't have an

22  interest.  They were paid back like all of them were just in

23  the normal course where instead of going out and getting a bank

24  loan, an entity needs to pay and they're usually in amounts

25  like pay their accountants or borrow the money from another

1    entity.

2          That did happen a handful of times.  Forenski's

3    (phonetic sp.) where she didn't have an interest, some of the

4    newer ones where she didn't want to invest.  They've all been

5    paid back, there's zero calculation of any interest rate that

6    should be ascribed to that, how long it was outstanding or

7    whether it was improper to begin with to do that as a business

8    matter.  And no evidence, no suggestion that if they hadn't

9    don't that that money would've been distributed to the owners

10   of the business.  No evidence whatsoever of that.

11         So for all of those reasons, your Honor, we

12   respectfully submit that there's no fact issue on those

13   intercompany loans that are claimed as part of the complaint.

14   If they put them in front of a jury totally apart from the

15   failure of proving that they did anything wrong there, there's

16   no basis on which a jury could calculate damages.  Are they

17   going to sort of come up with, presume a reasonable interest

18   rate to charged and do detailed calculations?  It's exactly

19   what is going here and what they're trying to do and there's no

20   basis for it.

21         Third, the third claim relates to a line of credit.

22   And this one what's not disputed is that there was a line of

23   credit, the Eagle Bank.  And what happened is after Mr. Coster

24   died within a couple of years they tried to clean up everything

25   and get the books straight relative to line of credit and who

1   owes what.  Because they had used this line of credit over the

2   years and they don't dispute this.  They haven't come forward

3   with any evidence suggesting this is wrong.

4            They used the line of credit over the years, the

5   company took out a line of credit from Eagle Bank and they used

6   it to fund the individual like Coster Realty and Schwat Realty

7   to fund their investments and individual real estate projects

8   and for other business purposes.  We put in affidavits about

9   that and there's no evidence to the contrary.  Ms. Coster did

10  not come forward and say for example that's not right, we paid

11  for Coster Realty's individual investments with our own money

12  and here's the check.  Zero evidence of that because they know

13  this is right.  They used the line of credit to fund the

14  investments that she is now getting distributions for.

15           So after Mr. Coster died the CFO calculates how much

16  is remaining to close out that line of credit and open a new

17  one and he's a guarantor on the line of credit.  And they had a

18  big distribution coming and so they deducted $172,000, they

19  split the amount in half 50-50 between Mr. Schwat and Coster.

20  Schwat Realty and Coster Realty got the same deduction from

21  their distribution of $172,000 and change.  Now Ms. Coster says

22  well you shouldn't have done that.  Well same thing, 50-50 so

23  then they go open a new line of credit and not have Coster on

24  it.

25           So their defense to our motion for summary judgement

1   on this seems to be well, he was a guarantor on the line of

2   credit, Mr. Coster was but this was another entity that was

3   obligated.  So essentially if I can boil it down it's well

4   Coster may have owed this money but you shouldn't have deducted

5   it from this distribution because there's no tie to this

6   particular entity that they took the distribution from.  And

7   really transparent, that's true that was not the entity that's

8   on the distribution but they're not denying the owed the money

9   and that there are relationships between these entities.

10          So the bottom line here on this one Your Honor again,

11   I don't see how there's any damage if they owed the money and

12   they can't refute that they owed the money.  They haven't come

13   forward with any evidence.  We put in detailed evidence of

14   exactly how much was owed, that Coster was a guarantor, that it

15   was used to fund the business operations when he was 50 percent

16   owner and to fund his own investments in real estate projects.

17   So there's no dispute that he owed the money, they just say you

18   took it from the wrong pocket basically.  So again, no issue of

19   fact to go in front of the jury there.

20          Next is probably the one that sounds the most

21   complicated but cutting through it it's really not and that's

22   with respect to this Capital Park Tower transaction.  There are

23   two entities, there's an investment entity where people invest

24   their money, have an investment piece in the property.  And

25   then a separate entity which is the Maryland Residential entity

1  that was the managing member entity that has a very tiny

2  fraction of the ownership in it.  But can depending on certain

3  economics result in distributions.

4          This claim again, they have no expert and no

5  calculation of damages.  So again at a pretty fundamental level

6  I don't see how it could go in front of a jury with no basis

7  for calculating any damages.  In their interrogatory answer on

8  damages they said damages in an amount of excess of $3 million

9  to be proven at trial, that's it.

10          So the facts that they can't dispute are, and the way

11  the claim is framed they have argued you defendants structured,

12  you timed and structured the sale for the purpose of squeezing

13  her out and keeping her from getting big profits.  Now this was

14  in the context of us defendants knowing she wanted a cash out

15  from there having prior opportunities for investments having

16  been presented to her.  She testified under oath repeatedly in

17  litigation that's already been going on, I don't want to invest

18  anymore with these guys period.  And we have emails saying you

19  know I want a cash out, that's it.

20          So Clark, you know the Clark Realty Capital and

21  related to the Clark Construction Company was the major equity

22  investor in this Capital Park Tower deal.  After Mr. Clark died

23  in 2016 the Clark organization said we don't want to do the

24  development piece of this.  You got to sell the property.

25  They're the major equity investor and plaintiff took their

1  deposition.  Their corporate representative said yep, that's

2  right, we made the decision.  We've got the major decision-

3  making authority under all the relevant documents and we've

4  decided, they decided we want to sell the property.

5          So a whole series of things happened related to

6  trying to sell the property.  One of the other minor owners

7  wanted to buy it, Schwat and Bonnell wanted to buy it so

8  there's some friction there.  The other minor investor puts

9  together a team, offers 69 million.  Schwat and Bonnell put

10  together two different major equity investors, big very

11  sophisticated businesses to buy it for 70.5 million.  So they

12  have the higher offer, they buy it.

13          Ms. Coster advised by her current counsel decided not

14  to participate further in that investment.  She was offered the

15  opportunity.  Now she says conveniently well if I had known all

16  these things because now it turns out the property's been

17  built, Mr. Schwat and Mr. Bonnell each had to sign and

18  testified under oath $51 million personal guarantees to make it

19  happen.  And she was completely unwilling to sign any

20  guarantees ever, that absolutely no question about that.  Now

21  she says, well I know I testified that I didn't want to invest

22  in any further deals with these individuals period but really I

23  kind of consider this one the same deal.

24          It's just not the same deal.  Clark said you got to

25  sell the property, the property was sold, new entity formed

1    with new major equity investors, Kayne Anderson and Lupert

2    Admur (phonetic sp.), very sophisticated investment firms who

3    are the major owners in these new entities.  So of course they

4    have to have new entities, new deals, it's a whole new

5    transaction, purchase of the property.  And Ms. Coster did not

6    say yes I want to participate.  I know I said before I didn't

7    want to but I want to.

8            Now her sole claim here is you structured this to

9    squeeze me out and I should've had an opportunity to invest.

10   No evidence of damage, no expert on value of the property,

11   nothing.  Just you structure this to squeeze me out.  The

12   problem with that is two-fold, well it's many fold but the two

13   most significant issues there are the evidence was

14   uncontroverted that Clark, the major equity investor decided

15   they wanted to sell the property.  Had nothing to do with Ms.

16   Coster.  Mr. Schwat and Mr. Bonnell couldn't have decided to

17   sell the property without Clark even if they wanted to.

18           Second, they don't identify any legal reason why for

19   a new deal, a whole new deal they had to offer her an

20   opportunity to invest.  They did, she says now well you did it

21   in a confusing way and it was misleading and you said these

22   things and you didn't give me this other information.  But

23   there's no legal reason why they had to offer her an

24   opportunity to invest in a totally separate new deal with them.

25           So for all of those reasons, Your Honor, and

1    additionally again, I don't know how this would go to a jury
2    with no basis for calculating damages whatsoever anyway.
3    There's just no issue of fact here and should not be allowed to
4    just go in front of a jury with the underlying theme of I
5    wouldn't want to be taking on a poor grieving widow in front of
6    a jury.
7             Finally they've asked for an equitable accounting.
8    The Court's already denied their motion for summary judgement
9    on equitable accounting.  Again, we've produced general
10   ledgers, we've produced so many thousands of pages of
11   documents.  One of the things the plaintiffs started off this
12   whole litigation march with books and records requests for a
13   whole host of entities and we've produced books and records
14   electronically and paper, general ledgers, tax returns, you
15   know you name it every financial statement.  So they haven't
16   because they can't make any showing that they said we'd like to
17   see your general ledger, we'd like to see this, we'd like to
18   see this and you guys just aren't showing it to us and that's
19   what you need to do before you get an equitable accounting.
20            And the remedy for an equitable accounting under the
21   caselaw that we've cited is to give discovery and they had
22   discovery.  Not just in one case but in five cases.  So it's
23   just no basis for an equitable accounting and that's not
24   something that would go to a jury it's an issue for the Court
25   anyway.  But we submit for the same reasons that the Court

1    denied their motion for summary judgement asking for an

2    equitable accounting.  Affirmatively the claim should be thrown

3    out.  And unless the Court has any further questions that's

4    what I have.  Thank you, Your Honor.

5              THE COURT:  All right, thank you.  Yes, sir.

6              MR. LEWISTON:  Good morning, Your Honor, and thank

7    you for your time this morning.  Your Honor, the story of this

8    case is simple.  Defendants have cheated their former business

9    partner's widow out of money owed to her through their mutual

10   real estate investment entities.  Now defendant's counsel spent

11   some time debating in her presentation trying to demean the

12   motives of plaintiff or plaintiff's counsel.  Your Honor, I'm

13   not going to spend too much time responding to those but

14   they're simply not true.

15             The reason that there are numerous lawsuits between

16   plaintiff and defendants is because plaintiff's late husband,

17   the former business partner of defendants founded numerous real

18   estate investment companies, incorporated and registered in

19   different jurisdictions.  So the Delaware case involved UIT

20   Companies, Inc.  A company formed between plaintiff's former

21   husband or late husband and defendants registered in Delaware.

22   The Delaware action involves control of that company.  This

23   lawsuit here involved UIP Maryland Residential.  One of those

24   real estate investment entities, it's not registered in

25   Delaware and it couldn't properly be venued in that Delaware

1    action.  That's why there's multiple pieces of litigation not

2    for the nefarious reasons that the defendant's counsel is

3    imputing.

4            Now just for a bit of background, Coster Realty is a

5    single member LLC owned by Ms. Coster who was originally formed

6    by her late husband Val Coster who passed away in 2015 after a

7    battle with cancer.  Coster Realty is engaged in numerous real

8    estate investment entities with defendants.  The one at issue

9    in this case is UIP Maryland Residential, LLC.  Coster Realty

10   owns a 48.75 percent interest in that entity.  Defendant Schwat

11   Realty also owns a 48.75 percent interest and defendant Bonnell

12   Realty owes a 2.5 percent interest.

13           Now despite the operating agreement's requirement

14   that distributions be pro rata among the members, and despite

15   the defendant's fiduciary duties they have done everything in

16   their power to ensure that their distributions are maximized

17   and Ms. Coster's distributions are as small as possible.  The

18   first way that they've done that is by giving 11 percent

19   distributions to Bonnell Realty every time there's a payout

20   from UIP Maryland Residential.  Now Bonnell Realty owns a 2.5

21   percent stake in UIP Maryland Residential but he always gets 11

22   percent of the distributions.  Now the defendants acknowledge

23   on this point that there are genuine disputes, material fact

24   that's inappropriate for summary judgement so they did not seek

25   summary judgement on that basis, on the propriety of those

1   payments and that is just going to go to trial.

2        The second way that defendants have attempted to

3   maximize the returns for themselves at the expense of Coster

4   Realty and Ms. Coster relates to the Capital Park Towers

5   investment project, the real estate project that UIP Maryland

6   Residential owned an interest in.  The Capital Park Towers are

7   two condo apartment buildings in southwest waterfront area of

8   D.C. and they represented I think the most significant real

9   estate assets owned by UIP Maryland Residential.  Coster Realty

10  through its 48.75 percent interest in UIP Maryland Residential

11  had a stake in the Capital Park Towers project.

12        Now in 2018 as defendants alluded to, Clark was

13  another investor in the Capital Park Towers project, not UIP

14  Maryland Residential but another investor, they're both

15  investors decided they didn't want to continue to invest in the

16  project because a corporate reorganization going on at Clark

17  relating to the death of Mr. Clark I believe.  So Clark decided

18  to exit the investment.  Now defendants try to argue that

19  because Clark decided to exit the investment they had no

20  control over the matter.  That's simply not true.

21        UIP Maryland Residential had its own interest in the

22  Capital Park Towers assets separate and apart from Clark.  They

23  were both investors in the project.  Clark had no ability to

24  force UIP Maryland Residential to sell his interests in the

25  assets.  Now then when there was a sell in 2018 the sell

1   occurred between UIP Maryland Residential as one of the sellers

2   and UIP Maryland Residential Six as one of the purchasers.

3   What is the difference between those two entities.  Well UIP

4   Maryland Residential, the subject of this litigation, Coster

5   Realty has a 48.75 percent interest in that entity.

6           UIP Maryland Residential Six, one of the now

7   investors in the Capital Park Towers project, the purchaser of

8   UIP Maryland Residential's interest Coster Realty has a zero

9   percent interest in UIP Maryland Residential Six, LLC.  Instead

10  the defendants who have 51 percent or so of UIP Maryland

11  Residential have 95 percent of UIP Maryland Residential Six.

12  And if you look at the purchase agreement that we submitted you

13  can see Mr. Schwat's signature on both the seller side and the

14  purchaser side, he signed for UIP Maryland Residential as

15  seller and UIP Maryland Residential Six as a purchaser.  That

16  is a clear conflict of interest, that's clear self-dealing and

17  breech of their fiduciary duties.

18          Now the first time that Ms. Coster learned about this

19  sale which occurred about this sale which occurred in April of

20  2018 and then August of 2018 for the two different Capital Park

21  Towers projects, the first time the defendants even mentioned

22  it to her was January of 2019.  They didn't seek her consent in

23  advance.  They didn't ask her whether she wanted to continue in

24  this investment.  They did it without her knowledge, without

25  her awareness until January of 2019 when one of their

 1    employees, Mr. Suskwo (phonetic sp.) emailed Ms. Coster

 2    notifying her of the change, of the sale from UIP Maryland

 3    Residential.

 4            Now in that email Mr. Suskwo gave absolutely no

 5    relevant information to Ms. Coster regarding that sale.  He

 6    never mentioned the name of UIP Maryland Residential Six.  He n

 7    ever mentioned that Mr. Schwat and Mr. Bonnell, the defendants,

 8    owned 95 percent of UIP Maryland Residential Six.  He never

 9    provided the appraisal the defendants had conducted relating to

10    Capital Park Tower Two, one of the two Capital Park Tower

11    assets.  Now that appraisal is really crucial in this case.

12    What that appraisal says is the current market value as of June

13    2018 approximately the time these entities were sold is $29.4

14    million at to Capital Park Tower Two, one of the two entities.

15            The actual sale price between UIP Maryland

16    Residential and UIP Maryland Residential Six $12.5 million.

17    That's a difference of $16.9 million which they discount the

18    defendants gave to themselves when they sold the interest of

19    that UIP Maryland Residential owned and Coster Realty and

20    directly owned to themselves at UIP Maryland Residential Six.

21    That appraisal is uncontradicted.  It is the only appraisal

22    conducted as to CPT Two, Capital Park Tower Two which is also

23    referred to as the Capital.  There's no evidence that

24    defendants have submitted that market value at the time that

25    they sold it was anything but $29.4 million.

1            Now there's also a CPT One, Capital Park Towers One.

2   That entity was sold for $58 million.  Same structure.

3   Defendants sold UIP Maryland Residential's interest in that

4   entity to themselves at UIP Maryland Residential Six without

5   even bothering to conduct an appraisal.  What that means is

6   that defendants did not follow their fiduciary duties to ensure

7   that their conflict of interest did not rise to the level of

8   self-dealing.  With Capital Park Towers Two it's clear it was

9   self-dealing.  It's clear that what they were doing was

10  transferring an entity that Ms. Coster had an interest in to a

11  new investment, the UIP Maryland Residential Six that only they

12  had an interest in.

13            When they finally did inform Ms. Coster about this

14  investment nine months after the first purchase agreement was

15  signed she asked for this appraisal and they refused to give it

16  to her.  They declined to give it to her.  They didn't even

17  mention it's existence.  If she had the appraisal at the time I

18  think her reaction at the time would have been different.  But

19  defendants make this argument that well you know, they didn't

20  have an obligation to ask her whether she wanted to reinvest.

21  Our claim is that when they sold UIP Maryland Residential

22  interests in Capital Park Towers to themselves at a below

23  market value that was a breach of their fiduciary duties to

24  avoid a conflict of interest and to avoid engaging in self-

25  dealing.

1          Now another mechanism that defendants have engaged in

2    to attempt to maximize their return from UIP Maryland

3    Residential and minimize what goes to Coster Realty relates to

4    the Eagle Bank line of credit.  And that is something that

5    defendants' counsel mentioned in her presentation.  We

6    submitted a promissory note that established this line of

7    credit and the promissory note is unambiguous.  The borrowers

8    are UIP Companies, Inc. and other UIP related companies

9    controlled by defendant.  The borrowers do not include Coster

10   Realty, Val Coster, UIP Maryland Residential, the subject of

11   this lawsuit.

12         Those are not borrowers on that line of credit and

13   they do not owe on the line of credit.  Now defendants' counsel

14   said that we concede that she owes it and it was just deducted

15   from the wrong entity.  That is not the case.  We certainly do

16   not concede that we owe it, that she owed it.  To the contrary

17   the unambiguous promissory note says that it's owned by

18   interests controlled by the defendant not by her personally.

19         Now her late husband, Val Coster signed the

20   promissory note on behalf of some of those other entities

21   because he was one of their corporate officers.  But just

22   because a corporate officer signs a promissory note on behalf

23   of his corporation does not mean that he personally is the

24   borrower on that line of credit.  And it certainly does not

25   mean that his widow now properly owes the funds on the line of

1   credit.

2          All that said, even though it's unambiguous that Ms.

3   Coster did not owe on this Eagle Bank deduction, defendants

4   took $170,000 from a distribution from UIP Maryland Residential

5   to pay off UIP Companies, Inc.'s debt to this line of credit.

6   They didn't ask her permission to do that, they didn't inform

7   her about it, they just took it from her.  We deposed Maryland

8   Residential's own CFO and asked him what's the relationship

9   between Maryland Residential and this line of credit.  An he

10  says the only relationship I'm aware of is that Mr. Schwat, one

11  of the defendants, instructed me to take this deduction from

12  the distribution of Coster Realty.

13          Now defendants have also attached a general ledger

14  detailing the draws and the payments on this line of credit.

15  The only time that Coster Realty is mentioned in that general

16  ledger which goes through the entire history of this line of

17  credit, every single payment, every single you know, every

18  single draw on the line of credit.  The only time that Coster

19  Realty is mentioned is precisely once.  This deduction of

20  $170,000 that defendants took from the distribution owed to

21  Coster Realty.  It is unambiguous, Your Honor, that Ms. Coster

22  did not owe on this line of credit and it was improper, a

23  breach of the Maryland Residential operating agreement and the

24  fiduciary duties the defendants have when they took this

25  deduction.

1          The next issue, intercompany loans.  Defendants own

2   numerous real estate investment companies and they have

3   continually caused UIP Maryland Residential to provide zero

4   interest loans to those other entities.  Now the damage is, is

5   the interest foregone on those loans.  They're providing zero

6   interest loans, no written approval in violation of the

7   operating agreement of Maryland Residential which requires

8   prior written approval.  And they're depriving UIP Maryland

9   Residential of the interest that it would potentially have on

10  issuing those loans which results in fewer funds available for

11  Ms. Coster.

12         And then the final issue, Your Honor, is on the

13  equitable accounting issue.  The way that defendants have run

14  UIP Maryland Residential through their combined 51 percent

15  interest is to provide the absolute minimum insight they can to

16  Ms. Coster.  That's why when they sold the Capital Park Towers

17  projects in the summer of 2018 or in April of 2018 with respect

18  to CPT Two they did not even inform Ms. Coster about it until

19  nine months after the fact.  That's why they take deductions

20  from her distributions for unrelated issues without even

21  telling her about it.

22         So what we're seeking is a full accounting of

23  Maryland Residential's financial obligation, its books and

24  record, its income statements and balance sheets so we can have

25  a full picture of what Ms. Coster owns in UIP Maryland

1    Residential.  Unless you have any questions, Your Honor, I

2    think I have completed.

3            THE COURT:  Let me ask you about the claim that you

4    are barred by limitations regarding the 2015 and 2016

5    distributions that were made to Coster Realty, LLC.

6            MR. LEWISTON:  Three points, Your Honor.  First, this

7    issue was already litigated at the motion to dismiss stage.

8    They raised this argument in their motion to dismiss based on

9    the face of the complaint.  We provided the same response we

10   did now in effect and the Court denied their statute of

11   limitations argument.  Now we're just litigating the same issue

12   and they're trying to get a second bite of the apple.

13           Second, Your Honor, the continuing harm doctrine or

14   the continuing course of conduct doctrine which we cited in our

15   motion to dismiss opposition and we cited again here provides

16   that when there's a continuing course of conduct which is what

17   has happened here, every single time that Maryland Residential

18   makes a distribution since Val Coster's death in 2015, every

19   single time they've provided 11 percent to Bonnell Realty even

20   though his pro rata share is only 2.5 percent.

21           THE COURT:  Is that true in 2015 and 2016?

22           MR. LEWISTON:  That's true throughout the entire time

23   period Your Honor.

24           THE COURT:  Okay.

25           MR. LEWISTON:  And then the third point, Your Honor,

1   is that defendants concede that the propriety of these 11

2   percent payments to Bonnell Realty but they are genuine speaks

3   to material facts as to the propriety of those payments.  That

4   means that the propriety of those payments is going to trial

5   and not only are there payments within the past three years but

6   we're also seeking injunctive relief to prevent continued 11

7   percent payments going forward.

8            THE COURT:  All right, thank you.

9            MS. BAUM:  May I briefly, Your Honor?

10           THE COURT:  Yes.

11           MS. BAUM:  I want to address a few factual issue that

12  I believe Mr. Lewiston neglected to point out in his

13  recitation.  First in reverse order with respect to the

14  continuing harm doctrine again, just not what the doctrine

15  says.  You don't get to revive old claims.

16           And with respect to the 11 percent claims I just

17  would highlight that this is not a UM 2.5 percent as Mr.

18  Lewiston suggested, we're just giving him 11 percent and we're

19  conceding that's wrong.  Just before he died, Exhibit 18 to our

20  motion is an email that was produced to us just before Mr.

21  Coster died he sent a projection to his family saying here's

22  how much I think I'm going to get out of all of these

23  investments.  And the percentage it showed going to Mr. Bonnell

24  11 percent because he knew that they had made that deal and

25  that 11 percent was going to be going to him, not 2.5 percent.

1   So this business about this is something sneaky done by the

2   defendant is just completely ignores Mr. Coster's own writing.

3           Interestingly too, the amount that he projected was

4   less than has already been distributed to his widow.  So the

5   whole we're starving her and not distributing enough, they've

6   already distributed more than he projected in that email would

7   be done in aggregate already and their lots of investments that

8   still haven't been sold.  Mr. Lewiston referenced with respect

9   to this supposed conflict of Mr. Schwat being on both sides of

10  the transaction and they said he sold it to an entity he owned

11  that he and Bonnell owned 95 percent of.

12          He is correct that they own 95 percent of the

13  managing member entity, Maryland Residential Six.  But what he

14  didn't tell Your Honor is that that entity owns a tiny sliver

15  of that whole project.  It's the managing member and I can't

16  remember off the top of my head and I just don't have it here

17  exactly how much but it's in the nature of a half a percent or

18  one percent or something like that.  A very small sliver.  So

19  yes they own most of that entity but it's the tiny sliver

20  entity.  There are major equity investors.

21          He also neglected to tell you when he was talking

22  about the appraisal that he claims our clients neglected to

23  give to Ms. Coster that the deal to sell these properties was

24  struck in April of 2018.  The date of this supposed appraisal,

25  and he also didn't tell you that Clark solicited a host of

1   broker opinions of values which their representative said

2   that's how we do it.  We get broker opinions of values.  They

3   got a bunch of them and the sale prices were right in range.

4   There were some that were a little higher initially and then

5   they adjusted them down and sale was right in the range of

6   those broker opinions of values.  That's why the other

7   competing bidder offered even less than the consortium put

8   together by Mr. Schwat and Mr. Bonnell with these two very

9   sophisticated entities each buying one part.

10          What happened with the appraisal which was done many

11  months later after the terms of the deal were struck was that

12  for the development parcel.  Mr. Lewiston I think forgot to

13  tell you this too.  With respect to the development parcel

14  there was already a deal to basically buy, it's a complicated

15  sort of Bradly structure, $12 million which was right in the

16  range of those broker opinions of value.  They got the

17  institutional investor because they needed to build the

18  building, the high-rise apartment building on it which is why

19  you get into the $51 million personal guarantees because you're

20  guaranteeing the performance of the construction and these big

21  equity institutions putting in tens of millions of dollars.

22          So they agree, one of them, one of the big

23  sophisticated institutions agrees we'll fund the purchase

24  price, the $12 million plus we're going to put in $17 million

25  right up front for construction funding and we're going to only

1    fund, we'll fund the 12 to fund the purchase initially and then

2    we're going to put in 17 as the building's constructed you

3    know, the way a construction loan normally works.  And their

4    lender, not Schwat and Bonnell, the lender for that funding

5    required an appraisal.  Apparently there was an appraisal done

6    long after the terms of the deal were cut and they said yes,

7    they came up coincidentally if you will to almost exactly to

8    the penny, the 12 plus the 17, $29 million for this part.  And

9    that was after the terms of that deal were struck and it was

10   solicited by the lender not by Schwat and Bonnell and there's

11   no evidence that Schwat and Bonnell even knew about it.

12          So that's the missing information or some of it with

13   respect to that whole transaction.  Again, what I didn't hear

14   is any legal basis why the defendants had any obligation to

15   structure a deal and give Ms. Coster who had repeatedly said in

16   any case I don't want to participate with you guys anymore, an

17   opportunity to come along and invest with them.  There's no

18   basis for a legal obligation to do that and no basis for a

19   damages claim.  They don't have an expert, they don't have a

20   damages calculation, we got nothing.

21          They also referenced that it was Clark's interest in

22   getting out of the deal.  They also didn't tell you and we

23   cited in paragraph 21 of our statement of facts which hasn't

24   been refuted, that Clark had major decision-making authority

25   over selling the asset not just it's own interest.  That's not

1  how these deals would ever work, they don't go and sell you

2  know, just their percentage interest in the project but they're

3  the major equity investor.  They get to say we're selling this

4  project and that's exactly what happened and that's what they

5  testified to.

6            Finally with respect to the Eagle Bank loan.  Again,

7  just to remind the same exact amount was deducted from Mr.

8  Schwat.  So what Ms. Coster is effectively saying is you

9  shouldn't have deducted this at all, that is tantamount to a

10 derivative claim.  And again we've made that argument in fact a

11 whole host of these.  And really what they are are derivative

12 claims because she's saying you know you sold this for too

13 little, Eagle Bank, this wasn't an obligation of this entity.

14 Again, didn't hear any reputation that was an obligation of Mr.

15 Coster or the estate or Coster Realty's but just you shouldn't

16 have taken it out at this time from this entity.  Well that

17 came out of Mr. Schwat in exactly the same amount and they

18 haven't disputed that at all.  50-50 came out of both sides.

19 His distribution got cut by the same amount of hers did to pay

20 off that line of credit that Mr. Schwat knew same as Coster

21 would've known that it was used to fund their own personal

22 investment.  So again really what, and we made these points in

23 our papers, they're tantamount to derivative claims because

24 these are injuries to the company they're not injuries to her.

25 Thank you, Your Honor.

1                          JUDGE'S RULING

2          All right, thank you.  All right, this matter comes

3   before the Court on a motion for partial summary judgement.

4   Various issues have been raised in a complex commercial setting

5   which factually there are extremely different versions that

6   have been presented to the Court of various aspects of

7   relationship between the plaintiff and the defendants in this

8   particular case.

9          The Court is constrained to find from what has been

10  argued that there are genuine disputes in material fact

11  particularly as to whether the continuous events theory

12  regarding the first matter, the 2015 and the 2016 distributions

13  that were made.  Whether that cause of action any that statute

14  may have told by virtue of that particular theory and I'm

15  referring to the Supik v. Bodie case at 152 Md. 698 722 a 2003

16  case.

17         And as to the other claims that are made which are

18  posited to be ripe for summary of judgement I find that there

19  are diametrically different versions of material facts which

20  are being presented which ultimately means that a tryer of fact

21  needs to examine.  Whether there is expert witnesses, whether

22  there's proof of damage or not I think is going to have to be

23  decided in a trial context.  So I am not going to grant the

24  motion for summary judgement in any respect, in fact I'm going

25  to deny it.  Thank you for your presentations.

1          MS. BAUM:  Thank you, Your Honor.

2          MR. LEWISTON:  Thank you, Your Honor.

3          THE COURT:  I've signed the order.

4          (The proceedings were concluded.)

33

√ Digitally signed by Tanja G. Gish

<u>DIGITALLY SIGNED CERTIFICATE</u>

**DEPOSITION SERVICES, INC.** hereby certifies that the
attached pages represent an accurate transcript of the
electronic sound recording of the proceedings in the Circuit
Court for Montgomery County in the matter of:

Civil No. 481393

COSTER REALTY, LLC

v.

SCHWAT REALTY, LLC, ET AL.


By:



_____
TANJA G. GISH
Transcriber