**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
**MARION COSTER,** *et al.***,**                               )
)
    **Plaintiffs,**                                        )
)
            v.                                      )        **Case No. 18-cv-01995 (APM)**
)
**STEVEN SCHWAT,** *et al.***,**                               )
)
    **Defendants.**                                    )
_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Marion Coster is a shareholder of UIP Companies, Inc. ("UIP"), a real estate

services company based in Washington, D.C.  Coster became a UIP shareholder after the death of

her husband, Wout Coster, a company founder.  Plaintiff has long wished to extricate herself from

her stake in UIP, and along the way she has accused other UIP shareholders of various forms of

corporate malfeasance.  This has led to litigation—lots of it.  For nearly a decade, Plaintiff has

fought a pitched battle with her fellow owners in Delaware and Maryland state courts and in this

one.  Still, Plaintiff is a stakeholder in UIP to this day.

In this case, Plaintiff sued her fellow UIP owners and directors, along with certain limited

liability companies through which they operate.  The defendants include: Steven Schwat and

Schwat Realty LLC; Peter Bonnell and Bonnell Realty LLC; and Stephen Cox and Cox Realty

LLC.  She brings both direct claims and derivative claims on behalf of UIP, asserting breach of

fiduciary duty, aiding and abetting a breach of fiduciary duty, and civil conspiracy.  At the heart

of her complaint is the contention that Defendants have breached their fiduciary duties by not

running UIP as a for-profit entity but instead operating it as a break-even enterprise to maximize personal benefits and rewards, but to her financial detriment. She also claims that Defendants have engaged in self-dealing by paying themselves additional income under the guise of consulting fees; issuing interest-free loans to real estate ventures in which Defendants have ownership interests; and funding defense costs in various litigations.

Before the court is Defendants' Joint Motion for Partial Summary Judgment. Defendants move for summary judgment as to Counts I through IV and VIII through XV of Plaintiff's Second Amended Complaint.[1] For the reasons explained below, Defendants' motion is granted.

## II.    BACKGROUND

The court does not provide a detailed factual recitation, but instead will reference the record as necessary to resolve the disputed issues. The court here recounts the events that brought the parties before the court.

UIP is a real estate services company formed under Delaware law in 2007 by Wout Coster (Plaintiff's deceased husband), Kees Bruggen, and Defendant Steven Schwat. Defs.' Joint. Mot. for Partial Summ. J., [hereinafter Defs.' Mot], ECF No. 97, Defs.' Stmt. of Material Facts in Supp. of Defs.' Mot., [hereinafter DSOF], ECF No. 97-1, ¶ 1. UIP has three wholly owned subsidiaries: UIP General Contracting, Inc., UIP Property Management, Inc., and UIP Asset Management, Inc. *Id.* UIP and its subsidiaries were formed to allow UIP's principals to control the management and development of the real estate investments of Special Purpose Entities ("SPEs"), in which UIP's

---

[1] Plaintiff does not dispute that she is collaterally estopped as to Count III by a Delaware court case, discussed below, and stipulates to its dismissal. Pls.' Opp'n to Defs.' Joint. Mot. for Partial Summ. J., ECF No. 101 [hereinafter Pls.' Opp'n], at 2 n.2. Further, the parties represent that they have reached a settlement in principle as to Counts V through VII, which relate to a transaction known as "Capitol Park Tower," so Defendants have not moved as to those claims. Defs.' Joint. Mot. for Partial Summ. J., ECF No. 97, at 1 n.1; Pl.'s Opp'n at 12 n.5. They also appear to be the only counts joined by Plaintiff Coster Realty. Second Am. Compl., ECF No. 48, ¶¶ 125–131. The court therefore in this opinion refers only to "Plaintiff," in the singular, despite there being two.

principals invest their own capital alongside third-party equity investors.  DSOF ¶ 2.  These investments are sometimes referred to as "promotes."  *Coster v. UIP Companies, Inc.*, C.A. No. 2018-0440-KSJM, 2020 WL 429906, at *2 (Del. Ch. Jan. 28, 2020) [hereinafter *Coster I*], *rev'd*, 255 A.3d 952 (Del. 2021).

"SPEs are high risk, high reward investments, typically requiring the UIP principals to tie up their own capital for long periods of time and to personally guarantee the investment to their lenders."  *Id.*  The risks were justified by the prospect of outsized profits from the SPE investments. *Id.*  "In order to mitigate the risks of the SPE investments while still chasing the reward, UIP principals formed UIP and its subsidiaries to control the management and development of the SPE properties."  *Id.*; *see also* Hr'g Tr., Dec. 16, 2024, at 5:6–6:2 (Plaintiff not contesting the foregoing factual findings of the Delaware court).  Critically, "[t]he principals did not envision that UIP would independently create value, but rather that it would create promote interests to the owner that are a multiple value of the operating companies."  *Coster I*, 2020 WL 429906, at *2 (cleaned up); *see also* DSOF ¶ 2 ("UIP's principals envisioned that UIP would create value for its shareholders by generating promote interests through the SPEs.").[2]  "[T]his type of structure is typical for the real estate industry."  *Id.*; Hr'g Tr. at 14:13-14 ("[W]e are not disputing that this structure is typical.").

### A.    Delaware Litigation

This dispute began with the passing of Plaintiff's husband in 2015, after which she became a 50% owner of the outstanding shares of UIP.  DSOF ¶¶ 6–7.  Defendant Schwat was the other

---

[2] Curiously, Plaintiff claims to dispute this factual finding of the Delaware court.  Hr'g Tr. at 6:13-18.  It is not clear how she can do that, as that finding bears all the hallmarks of having res judicata effect in these proceedings. *See Martin v. U.S. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007).  Regardless, Plaintiff nowhere disputed this fact assertion in her counterstatement of facts, so the court treats it as conceded, Fed. R. Civ. P. 56(e)(2).  *See generally* Pls.' Opp'n, Pls.' Stmt. of Genuine Issues of Material Fact, ECF No. 101-1.

50% owner. Plaintiff's ownership did not, however, afford her a seat or representation on UIP's board. *Coster I*, 2020 WL 429906, at *10. Starting in April 2018, Plaintiff attempted to secure a board seat by calling a series of shareholder meetings to vote on new directors, but each vote failed due to a 50/50 shareholder deadlock with Defendant Schwat. *Id.* at *8–10. As a result, the UIP board remained unchanged. *Id*. at *10.

Plaintiff then went to court to try to correct this state of affairs. On June 15, 2018, she filed an application in the Delaware Court of Chancery, seeking the appointment of a custodian for UIP under 8 Delaware Code § 226(a)(1)[3] (the "Custodian Action"). *See generally Coster I.* Two months later, on August 15, 2018, UIP's board approved the sale of one-third of UIP's shares, which were then unissued, to Defendant Bonnell. DSOF ¶ 15. That sale reduced Plaintiff's ownership share of the company from 50% to 33.3%. *Id*. Within hours of the approval, Defendants filed an Amended Answer in the Custodian Action, claiming that because the stock sale eliminated the shareholder deadlock, the Custodian Action was moot. *Coster I.*, 2020 WL 429906, at *10–11. On August 22, 2018, Plaintiff filed a separate complaint in the Court of Chancery to cancel the stock sale to Bonnell on the grounds that the transaction breached Defendants' fiduciary duties to Plaintiff. DSOF ¶¶ 16–17. The Delaware Court of Chancery subsequently consolidated the two actions. *Id.* ¶ 18.

The Court of Chancery held a two-day hearing in April 2019 and issued its decision on January 28, 2020. *See generally Coster I*, 2020 WL 429906. The Chancery Court found that the Stock Sale to Bonnell satisfied the applicable "entire fairness" standard, and therefore the UIP

---

[3] 8 Delaware Code § 226(a)(1) provides: "(a) The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians, and, if the corporation is insolvent, to be receivers, of and for any corporation when: (1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors . . . ."

board had not breached its fiduciary duties in approving the sale. *Id.* at *26. Because the sale eliminated the shareholder deadlock, the court declined to appoint a custodian. *Id.*

Plaintiff appealed the decision in *Coster I*, and the Delaware Supreme Court reversed and remanded to the Chancery Court "to consider the board's motivations and purpose for the Stock Sale." *Coster v. UIP Companies, Inc.*, 255 A.3d 952, 953 (Del. 2021). On remand, the Chancery Court again upheld the Stock Sale and declined to appoint a custodian, finding that "the UIP Board had a compelling justification for the Stock Sale." *Coster v. UIP Companies, Inc.*, C.A. No. 2018-0440-KSJM, 2022 WL 1299127, at *14 (Del. Ch. May 2, 2022). Coster appealed again, and this time the Delaware Supreme Court, sitting *en banc*, affirmed the Chancery Court's opinion in all respects. *Coster v. UIP Companies, Inc.*, 300 A.3d 656, 678 (Del. 2023) (*en banc*). Thus, the stock sale to Bonnell and Coster's attendant reduction in ownership were deemed lawful by the Delaware courts.

### B.    This Case

Plaintiff filed this suit in August 2018. Following the ruling in *Coster I*, on March 13, 2020, Defendants moved for summary judgment on res judicata grounds, arguing that the Delaware suit barred litigation of the claims made in this case. The court disagreed. Mem. Op. & Order, ECF No. 31. On September 24, 2021, the court granted leave to Plaintiff to file her Second Amended Complaint. Minute Order, Sept. 24, 2021.

Less than two months after the *en banc* decision by the Delaware Supreme Court, and before the close of discovery in this case, Defendants moved for partial summary judgment, and Plaintiff opposed. *See generally* Defs.' Mot.; Pls.' Opp'n to Defs.' Mot., ECF No. 101 [hereinafter Pls.' Opp'n].

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable factfinder could find for the nonmoving party; a fact is "material" only if it can affect the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

In assessing a motion for summary judgment, the court looks at the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Id.* at 255. To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor. *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015) (citing Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## IV.    DISCUSSION

Generally speaking, Defendants assert that Plaintiff has failed to come forward with *any* evidence that Defendants breached a fiduciary duty to Plaintiff, asserting that the record establishes, at most, that "the Defendants were poor businessmen." Defs.' Mot., Defs.' Mem. of P&A in Supp. of Defs.' Mot., ECF No. 97-2, at 3; *see also id.* at 11–15. Plaintiff's experts reviewed tens of thousands of pages of business records, yet they "assiduously stop[ped] short of ever actually opining that Defendants breached any duty, or cheated Mrs. Coster at all, much less systematically so." *Id.* at 12. The experts, Defendants say, failed to "identify a single transaction whereby money was improperly or unlawfully transferred to any SPE." *Id.* at 13.

Plaintiff responds that the factual record, including her experts' opinions, supports her various claims of breach of fiduciary in multiple ways. Her primary contention is that Defendants purposely ran UIP as a break-even entity, instead of a profit-maximizing one, contrary to their obligations under Delaware law. Pls.' Opp'n at 13–35. This business strategy, Plaintiff claims, was "designed to ensure that [Defendants] benefit from UIP while [she] does not." *Id.* at 14. Plaintiff also advances a secondary theory in three parts, each centered on the notion that Defendants engaged in "self-dealing transfers." *Id.* at 35. According to Plaintiff, Defendants: (1) "paid themselves millions in 'consulting fees' since 2015 with UIP funds, even though they are full-time salaried UIP executives"; (2) "used UIP funds to pay for their legal defense in cases in which UIP is not a party"; and (3) "issued no-interest loans to SPEs and other entities Defendants own and/or control, thereby depriving UIP of $373,232 in forgone interest payments." *Id.* These transactions, Plaintiff claims, "contribut[ed] to the destruction of [UIP's] value." *Id.* at 36.

The record supports none of these theories of breach.

### A.    Running UIP at Break-Even is Not a Breach of Fiduciary Duty

Plaintiff maintains that by "intentionally running the company at break-even over [her] longstanding objection since [her husband] died, Defendants have squandered the value of UIP, leaving [her] stake in UIP virtually worthless," in breach of their fiduciary obligations to her as a minority shareholder. *Id.* at 2. As support, Plaintiff points to financial records, testimony of former employees, and internal e-mails, which she claims establish a dispute of material fact as to whether Defendants "have *intentionally* run UIP at break-even." *Id.*

But Plaintiff's theory falters out of the gate because it rests on an incorrect legal premise: that Delaware law required UIP's directors to maximize profits at the entity level, with the end goal of making the highest dollar distributions to shareholders directly from UIP. *See, e.g.*, Pls.'

Opp'n at 17 (highlighting that "UIP is . . . chronically unprofitable"). That is far too narrow a conception of Delaware law.

Directors of a Delaware corporation are required to "promote the value of the corporation for the benefit of its stockholders." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013); *see also N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners.'") (citation omitted); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (stating "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *eBay Domestic Holdings., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010) (stating that for-profit corporate directors must "act[ ] to promote the value of the corporation for the benefit of its stockholders"). "Value . . . does not just mean cash. It could mean an ownership interest in an entity, a package of other securities, or some combination, with or without cash, that will deliver greater value over the anticipated investment horizon." *In re Trados*, 73 A.3d at 37–38. The standard of conduct for directors therefore requires that they "strive in good faith and on an informed basis to maximize the value of the corporation for the benefit" of its shareholders. *Id.* at 40–41. Plaintiff has not shown that Defendants failed to satisfy that standard.

The factual findings made by the Delaware Chancery Court about UIP's formation and purpose explain why. UIP's principals formed the company to service the real estate investments of SPEs, or "promotes," in which UIP's principals invested their own capital alongside third parties. *Coster I*, 2020 WL 429906 at *2. Notably, the "principals did not envision that UIP would independently create value." *Id.* UIP's purpose was different. It was to "control the management and development of SPE properties" "[i]n order to mitigate the risks of the SPE investments while

still chasing the reward." *Id.* As Plaintiff's late husband put it: "the only real value of UIP (Asset Management) is that it creates promote interests to the owner that are a multiple value of the operating companies." *Id.* at *2 n.10 (citing a 2014 email from Wout Coster). Thus, the value maximizing proposition for UIP shareholders was not to secure the highest distributions from UIP directly, but to secure superior returns through the SPEs.

Consistent with this business purpose, Defendants offered Plaintiff opportunities to make SPE investments after her husband's death. She declined. *See* Defs.' Mot., Ex. 3, Excerpt of M. Coster Delaware Trial Testimony, ECF No. 97-7, at 153:8-20 (agreeing that she decided against participating in projects called Tilden and Embassy). In fact, Plaintiff communicated that she "did not want to invest anymore in future projects with [UIP]." *Id.*, Ex. 2, Excerpt of M. Coster Delaware Deposition Transcript, ECF No. 97-6, at 64:14–65:11; *see also id.*, Ex. 3 at 153:21-24 (agreeing that she did not want to participate in any more projects with UIP "[p]eriod"). Even so, Plaintiff continued to derive benefit from nearly a dozen SPE interests that she inherited from her late husband. DSOF ¶ 9. Through these legacy interests, Plaintiff has received at least $2.8 million in payments from the SPEs serviced by UIP. *Id.* ¶ 12; Pls.' Opp'n at 11. Further, Plaintiff complains of never having received a profit distribution since her husband's passing from UIP, Pls.' Opp'n at 1, but it is uncontroverted that UIP has *never* made profit distributions or paid dividends to its shareholders, DSOF ¶ 11. Nor do the bylaws require it to do so. Defs.' Mot., Ex. 1, Bylaws of UIP Companies, Inc. [hereinafter UIP Bylaws], ECF No. 97-5, ¶ 42.

Plaintiff does not dispute any of these facts. Instead, she posits that Defendants were required to change UIP's business purpose and strategy because, now as a minority shareholder, she wished to take a different approach. Hr'g Tr. 9:17-23. Delaware law says otherwise. *See In re Trados*, 73 A.3d at 38 ("The duty to act for the ultimate benefit of stockholders does not require

9

that directors fulfill the wishes of a particular subset of the stockholder base.") (citing cases). Plaintiff's reliance on *eBay Domestic Holdings* is misplaced. Hr'g Tr. at 9:24–25. There, the court held that the founders of Craigslist had, over the objection of a minority shareholder, effectively run the company "for purely philanthropic ends." *eBay Domestic Holdings*, 16 A.3d at 34. The directors there had acted "because of their own personal preferences," and had "failed to prove at trial that they acted in the good faith pursuit of a proper *corporate* purpose." *Id*. (emphasis in original). Defendants' conduct here bears no resemblance to the Craigslist directors. They acted with a "proper corporate purpose": to maximize shareholder value in UIP by managing and developing the SPE properties to create high-yield investment opportunities.

Plaintiff further claims that her breach theory survives summary judgment because the record reflects at least a genuine dispute of fact as to whether Defendants ran UIP at a break-even mark, and because her expert, Andrew Manley, opines that, based on his industry experience, companies like UIP are run to make an "adequate return" within the entity. Hr'g Tr. at 13:16–23, 15:8–16:6; *see also* Pls.' Opp'n, Ex. 65, Expert Rep. of Andrew A. Manley [hereinafter Manley Rep.], ECF No. 101-66, at ¶ IV.p (stating that it is "illogical and untrue" that shareholders of a company like UIP would not "require an adequate return").

But even accepting Plaintiff's characterization of the financial records, and her expert's view of the industry, she does not prevail. Manley did not opine that UIP was run to harm Plaintiff's interests in the company. Instead, he only explained that companies like UIP can operate at profit margins greater than 6%, which was the average margin reported in a benchmark study on residential property management firms from October 2016 to September 2017. *See* Manley Rep. at ¶ IV.z–ee. UIP's average gross profit margin from 2015 to 2021 was 5.64%. Pls.' Stmt. of Genuine Issues of Material Fact, [hereinafter PSOF], ECF No. 101-1, ¶ 32. The

record thus establishes that UIP's owners possibly could have run the company to earn higher profits. But that is not the same as proving that Defendants failed to run UIP to maximize its shareholders' value. Plaintiff admits that Defendants offered her opportunities to invest in promotes intended to generate substantial profits, but she declined to participate. She has not argued that she would *not* have earned greater returns if she had invested in the SPEs. Moreover, Plaintiff concedes that UIP did not make distributions, so even if UIP had earned greater profits, it would not have been shared with her or any other owner. Plaintiff has failed to prove that Defendants ran UIP in a way that denied her value in her ownership of the company.

### B.    Plaintiff's Remaining Theories of Breach

#### 1.    The Business Judgment Rule Applies

Before turning to Plaintiff's secondary theories of breach based on alleged self-dealing, the court must determine the appropriate standard to apply to them.

The baseline standard under Delaware law is the business judgment rule. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994). Under the business judgment rule, it is presumed "that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Id.* (internal quotation marks and citation omitted) (alteration in original). "The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment." *Id.* (internal quotation marks and citation omitted). The presumption is a "powerful" one. *Id.* at 361. "[A] decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Id.* (citation omitted).

11

A plaintiff bears the burden of rebutting the presumption. *See id.* She must "provid[e] evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good faith, loyalty or due care." *Id.* (emphasis omitted). Failure to do so means the business judgment rule "attaches to protect corporate officers and directors and the decisions they make, and . . . courts will not second-guess these business judgments." *Id.* at 361.

If a plaintiff successfully rebuts the rule, "the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the 'entire fairness' of the transaction to the shareholder plaintiff." *Id.* Under that standard, "the defendant directors must establish to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Id.* (emphasis in original).

Plaintiff asserts that the entire fairness standard applies here but makes no effort to carry *her* burden. She mistakenly places it on Defendants. Pls.' Opp'n at 15 n.7 (asserting that, "[h]ad [Defendants] requested" a "ruling on whether intentionally running UIP at break-even is justified," then "the entire fairness standard would govern"). She then insists that "the entire fairness standard would . . . bar a grant of summary judgment, because—as owners of both UIP and the SPEs— Defendants 'stand on both sides' of the challenged transactions." *Id.* (quoting *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 898 (Del. Ch. 1999)). But that is a bald assertion of fact and law. Plaintiff must provide "evidence" to rebut the business judgment rule, and she fails to offer any. *Cede*, 634 A.2d at 361.

In any event, the record does not support applying the entire fairness standard. "To establish that a *board* was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the *individual members* of that board." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (emphasis in original). "To rebut successfully business

12

judgment presumptions in this manner, . . . a plaintiff must normally plead facts demonstrating 'that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.'" *Id.* (citation omitted); *Cede*, 634 A.2d at 363 ("This Court has never held that one director's colorable interest in a challenged transaction is sufficient, without more, to deprive a *board* of the protection of the business judgment rule presumption of loyalty.") (emphasis in original).

Defendants are correct that Plaintiff "cannot show (nor has she even attempted to show) that a majority of the Board stood on both sides of the consulting fee transactions." Defs.' Reply in Supp. of Defs.' Mot., ECF No. 105 [hereinafter Defs.' Reply], at 15. For instance, for any consulting fee payment, at least two of the three directors were not "interested." *Id.* While Schwat may have been interested in the consulting fees payments that he personally received, neither Bonnell nor Cox were, and Plaintiff has not shown otherwise. *Id.* As to the zero-interest loans, Coster does not even attempt to establish that a majority of the directors were interested in any particular loan transaction, let alone in all of them. Pls.' Opp'n at 38–39. For instance, she highlights hundreds of thousands of dollars of loans to Schwat Realty LLC but does not explain how that renders Cox or Bonnell interested in those transactions. *Id*. at 38. Finally, she fails to even address how the decision to indemnify Defendants in certain litigation gives rise to entire fairness review.

At oral argument, Plaintiff appeared to suggest that interests other than pure financial motivation created a conflict of interest within the board. Hr'g Tr. 25:6-12, 28:3-15, 30:19-23. If a plaintiff can show that "a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits," such that those directors are "not independent and therefore cannot count toward the requisite board

majority," then entire fairness may apply. *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 687 (Del. Ch. 2023). But such a showing requires *evidence*, and other than the fact of the transactions themselves, Plaintiff has produced none. And in any case, Plaintiff waived these arguments by failing to raise them in her brief. *See Ark Las Vegas Rest. Corp. v. N.L.R.B.*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003). Thus, Plaintiff's remaining claims are subject to the business judgment rule.

### 2. *Consulting Fee Payments*

Plaintiff takes issue with over $2.3 million in consulting fees that UIP paid to Defendants Schwat Realty LLC and Bonnell Realty LLC. Pls.' Opp'n at 36. According to Plaintiff, this was done to report the payments as 1099 income, purportedly in violation of IRS regulations. *Id*. Additionally, Plaintiff's proffered expert opined that these payments were "highly unusual." Pls.' Opp'n, Ex. 67, Expert Report of Robert B. McDonald [hereinafter McDonald Rep.], ECF No. 101-68, ¶ 66. Defendants respond that Plaintiff has not come forward with any evidence that these payments were improper or unreasonable, and that Plaintiff is collaterally estopped from contesting the propriety of these consulting fees based on the Delaware litigation. Defs.' Reply at 16, 19–23.

Putting aside the issue of collateral estoppel, Plaintiff fails to make the case that these payments were improper and resulted in a breach of fiduciary duty. She offers no proof regarding the board's knowledge and consideration of the consulting agreements, only that UIP made such payments. PSOF ¶¶ 25, 119–20. Her expert observed that the consulting payments were "highly unusual," but he offered no factual basis for that assertion. McDonald Rep. ¶ 66. Therefore, consistent with the business judgment rule, the court presumes that the directors acted on an informed basis, in good faith, and with the honest belief that such agreements were in the

company's best interest. *See Cede*, 634 A.2d at 360. And, given the absence of facts surrounding the transactions, the court cannot find that the payments lacked any rational business judgment.

Plaintiff's bald assertion of an IRS regulation violation does not move the dial. Plaintiff declares, without elaboration, that (1) the consulting fees violated an IRS regulation, and (2) the violation constitutes a *per se* breach of fiduciary duty. Pls.' Opp'n at 36 n.13. Defendants contest both points. Defs.' Reply at 6 n.6. But, again, Plaintiff has come forward with no proof about the fees other than their payment. Her mere say-so of a violation is not enough. Nor did she establish that Defendants acted with an intent to violate any tax regulations. *See Freedman v. Adams*, C.A. No. 4199-VCN, 2012 WL 1345638, at *11 (Del. Ch. Mar. 30, 2012) ("This Court has recognized that a director acts in bad faith when he acts with the intent of violating applicable positive law.") (citation omitted). A conclusory assertion that Defendants intentionally violated a tax regulation violation does not create a genuine dispute of material fact.

### 3.    *Zero-Interest Loans*

Plaintiff's breach theory premised on zero-interest loans also suffers from a complete lack of proof.

The record establishes that UIP made zero-interest loans to various SPEs, totaling nearly $7 million, and that there were no formal loan documents, only entries in UIP's financial records. That is the sum and substance of the evidence. PSOF ¶¶ 124–26.[4] Plaintiff provides no proof as to how the loans were made, who approved them, and what the rationale was for those decisions. She seems to believe that the mere fact of the loans was a breach. That is not enough to overcome the business judgment rule in the ordinary case. *See Cede*, 634 A.2d at 360–61. And it is even

---

[4] Plaintiff herself has benefited from some of these loans, as she holds a direct or indirect interest in the SPEs that received them. Defs.' Reply at 17 (stating that Plaintiff has an interest in eleven entities); Pls.' Opp'n at 39 (acknowledging an interest in at least three loan recipients).

more wanting in this case, where UIP's by-laws expressly contemplate related-party transactions and hold directors harmless for such transactions, so long as they are disclosed to the board. UIP Bylaws ¶ 47 (contemplating related-party transactions "as freely as though such adverse interest did not exist," and providing that "no director . . . shall be held liable to account to the Corporation or to any . . . stockholder of the Corporation for any profit or benefit," "provided that the nature of the interest . . . be known by or disclosed to a majority of directors"). This theory of breach fails.

### 4. Indemnification

Finally, Plaintiff argues that Defendants breached their fiduciary duties by using UIP funds to pay for attorney's fees in cases that have nothing to do with UIP. Pls.' Opp'n at 37–38. She points to the bylaws, which she says permits indemnification *only* for suits in which a director is made party "by reason of his being or having been a director or officer of the Corporation." *Id.* at 38 (internal quotation marks and citation omitted). The suits in question were brought by Plaintiff against the individual directors "in their capacity as managing members of the SPEs at issue in those cases," so they were not entitled to fees paid by UIP. *Id.* at 38.

Plaintiff, however, completely ignores a different portion of UIP's bylaws. They provide that "nothing herein contained shall be deemed to restrict the right of the Corporation to indemnify the directors, officers or any agents or employees of the Corporation in such cases as it deems appropriate even though not specifically provided for in this Article." UIP Bylaws, ¶ 48. Thus, contrary to Plaintiff's position, indemnification for legal fees is not limited to cases in which the individual directors were sued only in the capacities as directors or officers of UIP. The board had the authority to authorize legal fees payment for the directors for other types of suits.

In any event, Plaintiff once more fails to put forward any proof as to how the decisions to indemnify were made, who made them, or what the basis was for those decisions.  PSOF ¶¶ 121–23.  She therefore cannot overcome the business judgment rule.

## V.    CONCLUSION

For the reasons stated above, Defendants' Joint Motion for Partial Summary Judgment, ECF No. 97, is granted.  Judgment is entered in favor of Defendants as to Counts I, II, IV, and VIII through XV of the Second Amended Complaint.  Additionally, the parties have stipulated to dismissal of the remaining counts not addressed in the Memorandum Opinion. Stipulation of Partial Dismissal With Prejudice and Without Costs, ECF No. 104.

A final, appealable order accompanies this Memorandum Opinion.

Dated:  July 25, 2025

                                         _____
                                              Amit P. Mehta
                                         United States District Judge